# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **LISA ALYN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:15-cv-00596** |
| | ) | **JUDGE CRENSHAW** |
| **SOUTHERN LAND COMPANY, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Lisa Alyn is a real estate agent who lives and sells property in a subdivision near Franklin, Tennessee called "Westhaven" using the business name "Westhaven Franklin." (Doc. No. 114 at 7–8.) She promotes her real estate business through domain names that include the term "Westhaven." (Id. at 10–11.) Southern Land Company, LLC ("Southern Land") developed the Westhaven subdivision, has registered trademarks for W WESTHAVEN and WESTHAVEN, and transacts its real estate business in the Westhaven subdivision through a business called "Westhaven Realty." (Id. at 1, 4.) Alyn's First Amended Complaint raises the following claims against Southern Land: (1) declaratory judgment that her use of the term "Westhaven" does not infringe on any exclusive trademark right of Southern Land pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq.*; (2) cancellation of federal trademark registrations under 15 U.S.C. § 10604; (3) tortious interference with business expectancies and relations under state law; (4) unfair competition under the Lanham Act; and (5) defamation under state law. (Doc. No. 37 at 9–13.) Southern Land has raised the following counterclaims: (1) cybersquatting under 15 U.S.C. § 1125(d); (2) trademark infringement under 15 U.S.C. § 1114 and common law; (3) false designation of origin, false description and representation under 15 U.S.C. § 1125, *et seq.*; and (4)

violation of Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq.* (Doc. No. 38 at 29–36.)

Alyn has filed a motion for partial summary judgment as to liability on a portion of her defamation claim. (Doc. No. 78.) Southern Land has moved for partial summary judgment on its trademark infringement (statutory and common law), cybersquatting, and false designation of origin claims. (Doc. No. 85.) Southern Land also moves for summary judgment on all of Alyn's claims. (Doc. No. 82.)

For the reasons that follow, Alyn's motion for partial summary judgment on her defamation claim is **DENIED**. Southern Land's motion for partial summary judgment is **GRANTED** on its statutory and common law trademark infringement claims and its false designation of origin claim, but **DENIED** as to its cybersquatting claim. Southern Land's motion for summary judgment on Alyn's claims is **GRANTED**.

Also before the Court is Southern Land's motion to exclude Alyn's proffered expert testimony. (Doc. No. 80.) That motion is **DENIED** in part and **DENIED AS MOOT** in part.

I.      **Factual and Procedural History**

A.  **Southern Land**

In the early 2000s, Southern Land selected the name "Westhaven" when it began development for a large residential real estate project in Franklin, Tennessee. (Doc. No. 114 at 1.) Southern Land engages in real estate development, horticulture operations, golf course ownership and management, property management, and resale real estate operations related to the project. (Id. at 4.) Its real estate work is handled through its division named Westhaven Realty, which is physically located in the Westhaven subdivision. (Id. at 4.)

On November 9, 2000, Southern Land registered the domain name www.westhaventn.com. (Id. at 2.) On June 20, 2003, Southern Land filed its application to register marks for WESTHAVEN and W WESTHAVEN. (First Amended Complaint, Doc. No. 37 at ¶¶ 20–21.) On January 5, 2004, the trademark examiner issued two Office Actions—one for each of Southern Land's applications—each of which required Southern Land to indicate whether "WESTHAVEN" had any significance "in the relevant trade" or "any geographical significance." (Id at ¶ 23; Office Actions, Doc. No. 37-2.) On July 6, 2004, Southern Land responded to each Office Action: "Applicant submits that 'WESTHAVEN' does not have any significance in the relevant trade, or any geographical significance." (Doc. No. 37-3.)

On June 6, 2006, Southern Land obtained U.S. Trademark Registrations from the United States Patent and Trademark Office ("PTO") for a W WESTHAVEN word and design mark (U.S. Reg. No. 3,101,150) and the WESTHAVEN word mark (U.S. Reg. No. 3, 101,151) for use with a number of real estate-related services, including "real estate brokerage services, leasing of real estate, real estate management," and "real estate development." (Doc. No. 114 at 2-3; Doc. No. 38-1; Doc. No. 38-2.) The registrations show that Southern Land first used the marks in commerce on January 31, 2002. (Doc. No. 38-1; Doc. No. 38-2.) Because the WESTHAVEN marks were in continuous use for five years, Southern Land filed a Declaration of Incontestability with the PTO. (Doc. No. 114 at 3–4.) The parties agree that Southern Land's WESTHAVEN marks are now incontestable pursuant to 15 U.S.C. § 1065. (Id. at 4.)

## B. Alyn

Alyn is a licensed real estate agent who moved to a home in Southern Land's Westhaven development in 2008. (Id. at 7–8.) In 2009, Alyn began publishing a blog called "Westhaven Weekly" about life in the Westhaven neighborhood. (Id. at 8–9; Doc. No. 29-1 at ¶ 7 (Alyn Decl.)).

In January 2010, she created the domain name westhavenweekly.com to serve as a new outlet for publishing the blog. (Doc. No. 29-1 at ¶ 8.) She has used this domain name since then, and it now resolves to her current website. (Id.) Alyn offers her affidavit stating that before she created this domain name, she contacted Brian Sewel, Vice President of Southern Land, and that he gave her verbal permission to use that domain name. (Id.)

In 2012, Alyn registered the domain names www.westhavenfranklin.com and www.westhavenfranklin.net. (Doc. No. 114 at 10.) The parties dispute whether Southern Land was aware of Alyn's ownership or use of these domain names when she registered them and whether it gave her permission to use the WESTHAVEN marks on her website or in her domain name. (Id.) Alyn's declaration states that she contacted Sewel before activating these domain names, and that he once again approved her use of the term "Westhaven" in her domain names. (Doc. No. 29-1 at ¶ 9.) Southern Land disputes that it gave Alyn permission to use "Westhaven" in her domain names. (Doc. No. 114 at 10.) After registering the challenged domain names, Alyn began preparing a website to promote her real estate services. (Doc. No. 29-1 at ¶ 10.)

### C. Communications Between Southern Land and Alyn

In February and March 2013, Alyn and her staff communicated by email with Mary Lee Bennett, Southern Land's Marketing Manager, about the content of her website, all from email addresses that ended in @westhavenfranklin.com. (Id. at 2–3, 19–40.) Alyn's declaration states that she engaged in this communication about the development of her websites and marketing materials at the request of Sewell. (Id. at ¶ 11.)

On February 21, 2013, Alyn's assistant, Becky Best, emailed Bennett with a proof of a "For Sale" sign that she intended to use in her real estate business. (Doc. No. 29-1 at 2, 37.) The sign

proof had the words "Westhaven Franklin," which is how Alyn has branded her business, on it. (Id. at 2, 38.) Bennett responded by email, "We should be good." (Id. at 37.)

On March 19 and 20, 2013, Bennett had further email exchanges between Alyn and her staff about Alyn's website that used the term "Westhaven" in its domain name. On March 19, 2013, Bennett sent the following message by email:

> Your website looks really good. While I don't mind if you use the images from our website, I do have a problem with you taking content directly from the site. Please call me. I would like for you to develop your own content about the community. The builder page is a good example of what I am talking about. Thanks for your cooperation in this regard as I work really hard at keeping our content fresh and accurate.

(Doc. No. 29-1 at 20.) On March 20, 2013, Bennett emailed Alyn again to request again that Alyn remove the content copied from Southern Land's websites "immediately" because it had come to Bennett's attention that Southern Land "may be penalized by Google if there are two websites with the exact same content" and she "would not want for either of our site [sic] to have any issues as a result of this." (Id. at 21.) Alyn responded that her staff was "working on this full time as of today to re-write material." (Id.)

On March 27, 2013, Bennett sent an email to Alyn asking her yet again to make changes on her website because "much of the text" was still from the Southern Land site, and the formatting of the pages was "extremely similar" to that of the Southern Land site. (Id. at 25.) The email instructed Alyn as to which sections needed to be changed, stated that the "Westhaven materials are protected by copyright and you are currently violating that copyright," and ended, "I would hate for this to turn into a legal issue." (Id. at 25–26.) In a follow-up email later that day, Bennett instructed Best to provide a link on Alyn's site to Southern Land's site for details about the golf course that is available to Westhaven residents. (Id. at 28–29.) On May 13, 2013, Bennett emailed Alyn to ask her to be sure that her website clarified that some events, such as an upcoming concert

series, are not open to the public, and thanked her for her "help with making sure we communicate this accurately." (Doc. No. 114-3 at 45.) Bennett testified that, although she was the marketing manager and responsible for identifying domain names that use the term "Westhaven," she overlooked the use of the term in Alyn's domain name. (Doc. No. 114-3 at 12.)

Alyn offers evidence of other businesses located in the Westhaven development that use "Westhaven" in their names, such as Westhaven Dentistry, The Academy of Westhaven, another real estate agent who promotes her services at westhavenhomes.net, and a business providing chiropractic services in Westhaven that uses the domain name westhavenhealth.com. (Doc. No. 29-1 at 41–44.)

### D. Cease and Desist Letter

In September 2013, Matt Magallanes, who has worked at Southern Land in different roles since 2005, raised concerns about Alyn's use of the term "Westhaven" with Southern Land executives. (Doc. No. 114-1 at 7, 8, 10, 12, 27.) In October 2013, Southern Land sent Alyn a cease and desist letter requesting that she stop the alleged infringement of the WESTHAVEN marks. (Doc. No. 114 at 13–14.) At that time, Alyn had only been working for a few months for SilverPointe Properties, LLC ("SilverPointe") and she informed her managing broker, David Guilbert, that Southern Land was questioning her use of the WESTHAVEN trademarks. (Id. at 8, 14.) Alyn represented to him that Bennett had authorized her to use certain content from Southern Land's website on her website and did not object to her domain name or use of the WESTHAVEN marks. (Id.)

Since Southern Land began complaining about Alyn's use of the term "Westhaven," Alyn has included a disclaimer on her website stating her lack of affiliation with Southern Land. (Doc.

No. 29-1 at ¶ 15 and pp. 43, 47.) On other marketing materials, however, this disclaimer does not appear, but her real estate agency is identified. (<u>Id.</u> at 48–52.)

### E. Williamson County Association of Realtors Ethics Complaint

On April 10, 2015, Matt Magallanes, who was then a real estate agent with Westhaven Realty, filed an ethics grievance complaint with the Williamson County Association of Realtors ("WCAR") alleging that Alyn was misappropriating Southern Land's WESTHAVEN trademarks and marketing materials. (Doc. Nos. 89-8 at 44 (Ethics Complaint); 114 at 15–16, 19.) The complaint alleged a number of ethical violations, including her misappropriation of Southern Land's WESTHAVEN trademarks and marketing material. (Doc. No. 114 at 19–20.) Magallanes also gave information to WCAR about Alyn's website that he felt led to confusion with the WESTHAVEN mark because it had content that normally a developer, such as Southern Land, would have on its site, such as builder biographers. (<u>Id.</u> at 20 (citing Doc. No. 89-3 at 69, 79)). He also alleged that Alyn had copied content directly from Westhaven's website and signage, including custom artwork and design elements. (<u>Id.</u>; Doc. No. 114-1 at 54–55, 121.) Magallanes also claimed to have witnessed a number of other potentially unethical actions taken by Alyn, each of which Alyn alleges are false and were filed to portray her as an unethical and unprofessional real estate agent. (Doc. No. 114 at 21–22.) WCAR decided to hold the complaint in abeyance. (Doc. No. 114 at 24.)

Among Magallanes' allegations was the claim that Alyn had interfered in another agent's real estate transaction. Another realtor with Westhaven Realty, Sara Lavagnino, told Magallanes about the incident. (Doc. No. 103 at 1.) Lavagnino alleged that an individual named Mr. Chauhan was working with a realtor named Lisa Peebles to purchase property in Westhaven. (<u>Id.</u> at 1.) Westhaven Realty was representing the seller of the home, Sajid Khan. (<u>Id.</u>) According to

Lavagnino, Chauhan was in a coffee shop discussing the negotiations for Khan's home and Alyn eavesdropped on his conversation, then introduced herself and told him not to purchase the house at issue because it had water damage. (<u>Id.</u> at 1–2.) Chauhan did not purchase the house, and Lavagnino believes that a contract could have been made if Alyn had not interfered with the negotiations. (<u>Id.</u> at 2.) Lavagnino was not present for the alleged conversation, and Alyn, while admitting that she spoke to Chauhan, disputes the details of the encounter, including whether it was the result of her eavesdropping and whether she told Chauhan not to buy the home. (<u>Id.</u> at 2, 4–5; Alyn Dep., Doc. No. 102-2 at 3.) Alyn does not dispute that she told Chauhan that there was a "water issue" with the house and that Chauhan should "check that out" if he was "interested in the home." (Doc. No. 103 at 4–5.)

### F. Alyn's Termination From SilverPointe

The parties do not dispute that SilverPointe terminated Alyn based in part on the WCAR ethics complaint. (<u>Id.</u> at 17.) The parties dispute whether Southern Land was responsible for other bases for the SilverPointe's termination decision. Alyn alleges that Guilbert terminated her because Southern Land harassed SilverPointe with threats of litigation, made defamatory statements about her to SilverPointe, and instituted "discriminatory policies" meant to thwart her ability to conduct her business. (Doc. No. 37 at ¶ 36.) The "discriminatory policies" allegation refers to a policy Southern Land implemented that required that Guilbert, as Alyn's supervising broker, be present for any communications between Alyn and Westhaven Realty. (Doc. No. 114-12 at 26.) Guilbert testified that his inability to meet that requirement was one of the two primary reasons for her termination, and the other was Alyn's "inability to produce a document that she said existed way back . . . related to permission given by Southern Land" to use its mark. (<u>Id.</u> at 16.) Guilbert also testified that, upon his termination of Alyn, he required her to sign a hold-harmless agreement,

which was not required of other realtors being released, because he was concerned that SilverPointe may be sued or brought into litigation as a result of its relationship with her. (Id.) Guilbert also testified that Southern Land had never threatened SilverPointe with litigation, never made defamatory statements against Alyn, did not have "discriminatory policies against SilverPointe," and had never harassed SilverPointe, or pressured it to terminate it its contracts with Alyn. (Id. at 17.)

## II.    Southern Land's Motion to Exclude Alyn's Proffered Expert Testimony

Southern Land moves to exclude the testimony offered by Alyn's three expert witnesses.

### A.  Legal Standard

Under Rule 702 of the Federal Rules of Evidence, a proposed expert's opinion is admissible if it satisfies three requirements: (1) the witness must be qualified by knowledge, skill, experience, training, or education; (2) the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony must be reliable. Superior Prod. P'ship v. Gordon Auto Body Parts Co., 784 F.3d 311, 323 (6th Cir. 2015). "The Rule 702 inquiry is a flexible one and its focus must be solely on principles and methodology, not on the conclusions they generate." Id. (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 595 (1993)). "Similarly, Rule 702 directs courts to focus on the reliability of expert testimony, rather than the credibility and accuracy of that testimony." Id.

### B.  Analysis

#### 1.  Edward Timberlake

Edward Timberlake is a former examiner at the PTO, a former adjunct professor of trademark law, and a practicing trademark attorney. (Doc. No. 80-1 at 9–10.) He offers the following opinions: "Westhaven" is a geographically descriptive term; Southern Land's

misrepresentation to the PTO that the term was not geographically descriptive was material, in that the PTO likely would have refused to register the W WESTHAVEN and WESTHAVEN marks if Southern Land had indicated "Westhaven" was a term with geographical significance; and Southern Land's failure to so indicate to the PTO constituted fraud. (Id. at 2–6.) Southern Land argues that Timberlake's opinions are actually conclusions of law and, thus, are inadmissible. Berry v. City of Detroit, 25 F.3d 1342, 1353–54 (6th Cir. 1994). Alyn responds that, "[w]hether a mark is primarily geographically descriptive . . . is a question of fact," not a question of law. In re The Newbridge Cutlery Co., 776 F.3d 854, 857 (Fed. Cir. 2015). The concerns raised by Southern Land go to the weight, not the admissibility, of Timberlake's expert testimony.  As the Court finds no basis to exclude Timberlake's testimony, Southern Land's motion to exclude his testimony is DENIED.

### 2. Robert J. Fisher and Joseph C. Grubbs

Alyn offers the expert testimony of Robert J. Fisher and Joseph C. Grubbs on the issue of her damages. As set forth below, the Court has resolved liability on all claims in Southern Land's favor, it has no need to consider expert testimony as to Alyn's alleged damages. Accordingly, Southern Land's motion to exclude the testimony of these experts is DENIED AS MOOT.

## II.   Cross Motions for Summary Judgment

### A.  Legal Standard

 In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there is "genuine dispute as to any material fact and [whether] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court is required to view "the facts and reasonable inferences in the light most favorable to the nonmoving party." Ferrari v. Ford Motor Co., 826 F.3d 885, 891 (6th Cir. 2016) (citing Cass v. City of Dayton, 770 F.3d 368, 373

(6th Cir. 2014)). In a case involving allegations of trademark infringement, a plaintiff will be entitled to summary judgment if defendant lacks a meritorious defense and there is no "material issue of fact as to likelihood of confusion" between the marks. Gray v. Meijer, Inc., 295 F.3d 641, 651 (6th Cir. 2002).

**B. Analysis**

Southern Land moves for summary judgment on all of Alyn's claims (Doc. No. 82) and for partial summary judgment on its claims of statutory and common law trademark infringement, cybersquatting, and false designation of origin claims. (Doc. No. 85.) It does not move for judgment on its Tennessee Consumer Protection Act claim. Alyn moves for partial summary judgment as to liability on her defamation claim. (Doc. No. 78.)

**1. Alyn's Claim for Cancellation of Federal Trademark Registrations**

Alyn seeks the equitable relief of cancellation of Southern Land's federal registration of the WESTHAVEN marks. The Lanham Act authorizes district courts the discretionary authority to rule directly on the validity of a registration:

> In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.

15 U.S.C. § 1119; accord CFE Racing Prod., Inc. v. BMF Wheels, Inc., 793 F.3d 571, 593 (6th Cir. 2015) ("[T]he permissive language of § 1119, providing that the court "may" determine the right to registration, order cancellation of registrations, and the like, endows the district court with discretionary authority.") "A request for cancellation under § 1119 must be supported by a showing that (1) the party has standing to petition for cancellation because it is likely to be damaged, and (2) there are valid grounds for discontinuing registration." Id. (internal quotation marks and citation omitted).

Alyn asserts that Southern Land's WESTHAVEN marks should be cancelled because they were procured by fraud, which consisted of its knowingly making false material misrepresentations to the PTO trademark examiner when it stated that the term "Westhaven" had no "geographical significance." (Doc. No. 115 at 13–14.) According to Alyn, Southern Land was aware that the term "Westhaven" is primarily a geographical term used by other cities in the United States, such as Westhaven, Connecticut, and intended to deceive the PTO when it indicated that the term had no geographical significance.

Once a mark, such as Southern Land's WESTHAVEN marks, is "incontestable" pursuant to 15 U.S.C. § 1065, the defense that the mark is a geographical term is no longer available. <u>Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.</u>, 469 U.S. 189, 201 (1985); <u>Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.</u>, 109 F.3d 275, 282 (6th Cir. 1997); <u>Wynn Oil Co. v. Thomas</u>, 839 F.2d 1183, 1187 (6th Cir. 1988). However, the validity of an incontestable mark can be challenged on grounds of fraud. <u>In re Bose Corp.</u>, 580 F.3d 1240, 1243 (Fed. Cir. 2009). The Lanham Act "prohibit[s] an applicant from making *knowingly* inaccurate or *knowingly* misleading statements." <u>Id.</u> (internal quotation marks omitted; emphasis in original). Thus, "absent the requisite intent to mislead the PTO, even a material misrepresentation would not qualify as fraud under the Lanham Act warranting cancellation." <u>Id.</u> An "allegation of fraud in a trademark case, as in any other case, should not be taken lightly." <u>Id.</u> "A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof; . . . it must prove fraud 'to the hilt' with clear and convincing evidence." <u>Id.</u> "There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." <u>Id.</u>

To refuse registration for a mark that is "primarily geographically descriptive" in violation of 15 U.S.C. § 1052(e)(2), the "Trademark Examiner must show that: (1) the mark sought to be

registered is the name of a place known generally to the public, and (2) the public would make a goods/place association, i.e., believe that the goods for which the mark is sought to be registered originate in that place," and (3) "the source of the goods is the geographic region named in the mark." In re The Newbridge Cutlery Co., 776 F.3d 854, 861 (Fed. Cir. 2015); (citing Trademark Manual of Examining Procedure ("TMEP") § 1210.01(a)). Alyn argues that Southern Land's WESTHAVEN marks are geographically descriptive because the term has come to be used to refer to Southern Land's Westhaven Development, which has a geographic location. (Doc. No. 115 at 6–8, 14–16.)

When Southern Land chose the name "Westhaven" for its real estate development, the term was not "geographically descriptive" because there was no community by that name in middle Tennessee before Southern Land developed one. Indeed, the name could have been attached to real estate anywhere in middle Tennessee or any other area where there was not a preexisting "Westhaven." Thus, it was not "a place known generally to the public," in middle Tennessee, where it sought to establish its residential subdivision, and the public would not have made a "goods/place association." Southern Land's claim that "Westhaven" had no geographical significance, however, was made in response to the PTO's request in 2004, over two years after Southern Land's first claimed use of its marks in commerce. Two years does not strike the Court as an impossibly short period of time for the geographic name of a neighborhood to gain purchase in the minds of the public.

Southern Land, then, faced a situation in which its marks may have had, in at least a colloquial sense, some geographic significance, but that significance was only due to Southern Land's own commercial efforts in support of a name it selected. The TMEP recognizes the unique

13

issues related to such "coined locations"[1] and generally favors permitting registration: "The mere fact that a term may be the name of a place that has a physical location does not necessarily make that term geographic under § 2(e)(2). For example, names of amusement parks, residential communities, and business complexes which are coined by the applicant, must not be refused." TMEP § 1210.02(a). Courts as well have tended to respect the rights of parties seeking trademark protection for the names of locations that they themselves developed. See Pebble Beach Co. v. Tour 18 I, Ltd., 942 F. Supp. 1513, 1538 (S.D. Tex. 1996) ("Where a developer chooses an arbitrary mark to designate a development, the mark is protectable despite the geographic aspects of the development."); Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Imp. Corp., 53 S.W.3d 799, 808 (Tex. Ct. App. 2001) ("Because the mark 'Horseshoe Bay' is an arbitrary mark, coined by Lake LBJ Corp., and was not in prior use at the geographic site, we conclude that the district court did not err in resolving that the mark 'Horseshoe Bay' is not geographically descriptive."); Prestwick, Inc. v. Don Kelly Bldg. Co., 302 F. Supp. 1121, 1124 (D. Md. 1969) (enforcing trademark rights in the name of a housing development despite the name having acquired secondary geographic meaning); see also Bishops Bay Founders Grp., Inc. v. Bishops Bay Apartments, LLC, 301 F. Supp. 2d 901, 908 (W.D. Wis. 2003) (observing that developer's claim to rights in allegedly geographically descriptive mark was undermined by evidence that the name at issue appeared on maps before developer used it and therefore may not have been

---

[1] Alyn suggests that the Court cannot treat "Westhaven" as a "coined location" because other locations already exist known as Westhaven. While it is true that Southern Land cannot be said to have coined "Westhaven" generally as a word referring to *some* place, the Court sees no reason why that distinction should affect the underlying principles supporting the coined location exception, as long as Southern Land, as the applicant/registrant of the WESTHAVEN marks, is the originator of "Westhaven" as a term to refer to a location in Southern Land's area of business— middle Tennessee—and the surrounding area. Similarly, while many of the cited cases involved arbitrary marks whereas this one does not, see infra, the Court does not read those cases as precluding an application of their basic principles to a conceptually weaker mark.

developer-coined); <u>Dominion Fed. Sav. & Loan Ass'n v. Ridge Dev. Corp.</u>, No. CIV.A. 86-0140-A, 1986 WL 15438, at *3 (E.D. Va. July 24, 1986) (considering a trademark infringement claim based on a mark that was also the geographic designation of the rights holder's residential development).

Because Southern Land's WESTHAVEN marks are now incontestable, the question before this Court is whether Southern Land "knowingly made a false, material representation of fact" to the PTO, which Alyn must prove by clear and convincing evidence to prevail on her claim for cancellation of trademark on the basis of fraud. Southern Land could have informed the PTO that "Westhaven" did refer to a geographic location, but that Southern Land intended to rely on a coined location theory to establish that the mark was registrable. Instead, Southern Land merely stated that "Westhaven" "does not have any . . . geographical significance." If Southern Land had relied only on the legal assertion that "Westhaven" was not geographically *descriptive*—the term actually used by the Lanham Act, 15 U.S.C. § 1052(e)(2)—it might have been able to defend the assertion as an interpretation of the coined term exception. The claim that "Westhaven" had no geographic *significance*, however, is more problematic. Westhaven is a real location in middle Tennessee; it is difficult to argue that the name of an actual, identifiable geographic location has no geographic significance, even if that geographic significance would not necessarily preclude trademark registration.

Even a material misrepresentation, however, is not enough to mandate the cancellation of an incontestable mark in the absence of "clear and convincing evidence" that Southern Land intended "to mislead the PTO." <u>In re Bose Corp.</u>, 580 F.3d at 1243. Alyn has adduced no evidence to suggest that Southern Land's chosen language amounted to anything other than an arguably poor choice of words premised on a legitimate theory of its rights: that Southern Land could claim

the WESTHAVEN marks because they were not geographically descriptive when coined and had no relevant geographic significance independent of Southern Land's efforts. Because Alyn's allegation of fraud is based on "speculation, inference, or surmise," id., the Court will not cancel Southern Land's WESTHAVEN or W WESTHAVEN marks and enters judgment for Southern Land on Alyn's cancellation claim.

### 2. Trademark Infringement, False Designation of Origin, Unfair Competition

The Lanham Act prohibits the use of "any word, term, name, symbol or device, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ." Lanham Act, § 43(a)(1), 15 U.S.C. § 1125(a)(1). Alyn seeks declaratory judgment of trademark non-infringement under 28 U.S.C. §§ 2201 and 2202 *et seq.* (Doc. No. 37 at 9–10.) Southern Land counterclaims that Alyn has infringed on its trademark in violation of the Lanham Act, 15 U.S.C. § 1114. (Doc. No. 38 at 30–32.) To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party must show that: "(1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." Coach, Inc. v. Goodfellow, 717 F.3d 498, 502 (6th Cir. 2013).

Both Southern Land's claim of false designation of origin, false or misleading description, and false or misleading representation and Alyn's claim for unfair competition rest on § 43(a) of the Lanham Act, which provides in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device,

or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

Courts "use the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks." Audi AG v. D'Amato, 469 F.3d 534, 542 (6th Cir. 2006) (citing Two Pesos v. Taco Cabana, 505 U.S. 763, 780 (1992) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a 'likelihood of confusion?'").[2] To determine whether a likelihood of confusion exists, courts consider and weigh the following eight factors: "(1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines." Daddy's Junky Music Stores, Inc. v. Big Daddy\'s Family Music Ctr., 109 F.3d 275, 280 (6th Cir. 1997). Courts must be mindful that

[t]hese factors imply no mathematical precision, but are simply a guide to help

---

[2] Likelihood of confusion is also the basic test for common law trademark infringement. J. McCarthy, McCarthy on Trademarks § 23:1 (4th ed.2004); see Men of Measure Clothing, Inc. v. Men of Measure, Inc., 710 S.W.2d 43, 48 (Tenn. Ct. App. 1985) (holding that trademark infringement under Tennessee law is premised on the same likelihood of confusion analysis as infringement under the Lanham Act).

determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. But a thorough and analytical treatment must nevertheless be attempted. The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

Id.

"As to the first factor, '[t]he strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore the more protection it is due.'" Audi, 469 F.3d at 543 (quoting Frisch's Restaurant, Inc. v. Shoney's Inc., 759 F.2d 1261, 1264 (6th Cir. 1985). "Marks fall on a 'spectrum' that ranges, in order of increasing strength, from '(1) generic . . . and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful.'" Grubbs v. Sheakley Grp., Inc., 807 F.3d 785, 795 (6th Cir. 2015) (citing Champions Golf Club, Inc. v. The Champions Golf Club, Inc., 78 F.3d 1111, 1116–17 (6th Cir. 1996)).

Each level of increasing strength reflects a growing attenuation between the underlying product or service and the mark at issue. Representing the lowest level, a generic mark is one that merely "identif[ies] the genus of which a particular product is a species" and is "never entitled to trademark protection." Ward v. Knox Cty. Bd. of Educ., 612 F. App'x 269, 272 (6th Cir. 2015). "Examples of generic marks are 'aspirin,' 'escalator,' and 'light beer.'" Borescopes R U.S. v. 1800Endoscope.com, LLC, 728 F. Supp. 2d 938, 946 (M.D. Tenn. 2010) (citing Champions, 78 F.3d at 1117). One step higher, "[a] merely descriptive [mark] specifically describes a characteristic or ingredient of an article." Champions, 78 F.3d at 1117. For example, "School Coupons" is descriptive of coupon books sold in schools. Ward v. Knox Cty. Bd. of Educ., 612 F. App'x 269, 273 (6th Cir. 2015). Stronger than a descriptive mark is a suggestive mark, which "suggests rather than describes an ingredient or characteristic of the goods and requires the

observer or listener to use imagination and perception to determine the nature of the goods." <u>Innovation Ventures, LLC v. N.V.E., Inc.</u>, 694 F.3d 723, 730 (6th Cir. 2012). That level of distinctiveness still falls short of a truly arbitrary or fanciful mark, which "is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers." <u>Champions</u>, 78 F.3d at 1117.

As incontestable marks, Southern Land's marks are initially presumed to be at least descriptive. <u>Daddy's Junky Music Stores</u>, 109 F.3d at 282. At most, though, WESTHAVEN falls close to the border between "descriptive" and "suggestive." As Southern Land concedes, "west" refers to Westhaven's location west of Franklin, Tennessee. "Haven," by its dictionary definition, refers to a "place of safety." HAVEN, Merriam-Webster Dictionary (online ed. 2016). A name literally meaning "safe place to the west" is not particularly distinctive as applied to real estate. That weak distinctiveness is confirmed by the numerous other locations with "haven" in their names, including Westhaven, Connecticut. Finally, the evidence Alyn has introduced showing that at least some members of the public have grown to use "Westhaven" in a purely geographic sense shows further erosion of the mark's strength. The more strongly "Westhaven" is perceived to refer to the area in question, the less strongly it will be perceived to refer to services specifically furnished by Southern Land. <u>See</u> <u>Vail Assocs., Inc. v. Vend-Tel-Co.</u>, 516 F.3d 853, 867 (10th Cir. 2008) (upholding conclusion that an incontestable mark was not particularly strong, in part due to the geographic meaning of the mark). This factor accordingly weighs against finding a likelihood of confusion.

As to the second factor, relatedness of goods, "if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar." <u>Audi</u>, 469 F.3d at 543 (quoting <u>Daddy's Junky Music Stores</u>, 109 F.3d at 282). Alyn acknowledges that she and

Southern Land are both engaged in real estate services and concedes that this factor favors a finding of likelihood of confusion. (Doc. No. 115 at 20.) This factor weighs in favor of finding a likelihood of confusion.

As to the third factor, the similarity of the marks, "courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." Audi, 469 F.3d at 543 (quoting Daddy's Junky Music Stores, 109 F.3d at 283). The Sixth Circuit has held that, with respect to domain names, the addition of "generic or common descriptive words" along with the mark does not eliminate the likelihood of confusion. Id. (finding defendant's domain name www.audisport.com likely to cause confusion with plaintiff's "AUDI" trademark); PACCAR Inc. v. TeleScan Techs., 319 F.3d 243, 252 (6th Cir. 2003) (finding that defendant's domain names, such as www.peterbiltnewtrucks.com, had the same appearance as plaintiff's domain name www.peterbilt.com). The same result obtains here. "Westhaven Franklin" is similarly just the WESTHAVEN word mark with a geographic modifier. This factor strongly favors finding a likelihood of confusion.[3]

As to the fourth factor, evidence of actual confusion, "although such evidence is the best indicator of likelihood of confusion, the absence of actual confusion evidence is

_____

[3] Alyn argues that all of her websites and advertisements include a disclaimer stating that she is not associated with Southern Land, which weighs against a finding of likelihood of confusion. Taubman Co. v. Webfeats, 319 F.3d 770, 777–78 (6th Cir. 2003); Holiday Inns, Inc. v. 800 Reservation, Inc., 86 F.3d 619, 625 (6th Cir. 1996). This argument is unavailing. First, many of Alyn's materials do not contain a disclaimer. (Compare Doc. No. 29-1 at 43, 47 (with disclaimer) with 48–52 (without disclaimer)). Second, the Sixth Circuit found significant that in addition to the defendants' providing disclaimers in Holiday Inns and Taubman, they also directed errant telephone calls (Holiday Inns) and website traffic (Taubman) to the respective plaintiff's business. Taubman, 319 F.3d at 777–78. Alyn's website does not provide such a link to Southern Land's website, and the other materials that she submitted as documentation of her provision of disclaimers have no such disclaimer and no redirection to Southern Land. Alyn's disclaimer on some of her online posts do not mitigate against a finding that she is using Southern Land's actual trademark, which supports a finding of a likelihood of confusion.

inconsequential." Audi, 469 F.3d at 543. Southern Land offers the following evidence of actual confusion: some people confuse Lisa Alyn with Lisa Cahalan, who works for Westhaven Realty based on the similarity of the names (Magallanes Dep., Doc. No. 114-1 at 75); and some people mistakenly believed that Alyn worked for Westhaven Realty or otherwise confused the services of Westhaven Realty and Alyn (id.; Cahalan Dep., Doc. No. 114-10 at 10–13). (Doc. No. 121 at 8.) This evidence shows some actual confusion between Alyn and Westhaven Realty's services, which supports a finding of a likelihood of confusion.

The fifth factor requires the Court to consider "the similarity in the customers for the goods and services as well as in the marketing efforts employed by each party." Grubbs v. Sheakley Grp., Inc., 807 F.3d 785, 796 (6th Cir. 2015). Alyn provides evidence that Westhaven Realty primarily, if not exclusively, represents the builders/sellers of new construction homes in Westhaven, whereas she represents buyers and sellers of resale homes and buyers of new homes. (Doc. No. 115 at 20 (citing Cahalan Dep., 114-10 at 6–7)). Although these customer bases are distinct, they are still situated in the same broader market of home sales, such that a consumer might not understand the boundaries between the two companies' respective business models. The evidence of the parties' respective marketing strategies is insufficient to support a firm conclusion about their degree of overlap. This factor therefore is neutral.

The sixth factor requires consideration of the degree of customer care in selecting a particular good or service. "[C]onfusion is less likely in cases involving expensive or unusual services or unusually skilled buyers." Grubbs, 807 F.3d at 797. Individuals are likely to carefully select a real estate broker for a service as important as buying or selling a home. See Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1111 (6th Cir. 1991) ("[B]ecause selling one's property is likely the most significant commercial transaction ever undertaken for most

people, Specialists' customers are likely to carefully select the provider of sales services."). This factor favors Alyn's contention that there is not a likelihood of confusion.

For the seventh factor, "[p]roving intent is not necessary to demonstrate likelihood of confusion, but the presence of that factor strengthens the likelihood of confusion." AutoZone, 373 F.3d at 799. "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." Homeowners, 931 F.2d at 1111. Southern Land argues that Alyn incorporated the Westhaven mark into her competing business name and marketing materials with the intention of profiting from its work in building the Westhaven community. Alyn argues that she uses the term "Westhaven" to accurately describe where she lives and sells homes, and that she has not intended to cause confusion. (Doc. No. 115 at 22.) Because both parties offer plausible accounts of Alyn's motivations, this factor is neutral.

As to the eighth factor, the likelihood that product lines will expand, a "'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." Homeowners, 931 F.2d at 1112 (citing Restatement of Torts § 731(b) & comment c (1938)). Alyn argues this factor is not relevant to this case. (Doc. No. 115 at 22.) Southern Land argues that this factor favors finding confusion because Southern Land is increasingly likely to engage in real estate resale operations as the Westhaven development ages and there are more resales. (Doc. No. 121.) As Southern Land provides no citation to the record to support its contention that it will increasingly be engaged in resales in the Westhaven development, the Court finds this factor to be neutral.

On balance, these factors establish that there is a likelihood of confusion with regard to at least some of Alyn's uses of the term "Westhaven" in association with her business. While

Westhaven's mark is weak, the closely related services that Alyn and Southern Land provide and the similarity of their marks ultimately render the possibility of confusion inescapable.

### a. Alyn's Acquiescence Defense

Alyn asserts the affirmative defense of acquiescence, which requires a "finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." Kellogg Co. v. Exxon Corp., 209 F.3d 562, 569 (6th Cir. 2000). Unlike laches, acquiescence requires more than the "ordinary requirement of showing unreasonable delay and prejudice to the defendant." Id. (quoting Elvis Presley Enters., Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 894 (6th Cir. 1991)). "[A]cquiescence implies active consent, while laches implies a merely passive consent." Id. "To defeat a suit for injunctive relief, a defendant must also prove elements of estoppel which requires more than a showing of mere silence on the part of the plaintiff; defendant must show that it had been misled by plaintiff through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark." Id. at 574.

Alyn argues that there are disputed issues of material facts regarding her acquiescence defense which preclude summary judgment. (Doc. No. 115 at 22–23.) She argues that she informed Southern Land about her use of the term "Westhaven" for her real estate business as early as 2009, yet it did not object to her use of the term until October of 2013 when it sent her the cease and desist letter. (Id. at 23.) She has provided the Court with examples of her website in November 2009 to support her position that her website was promoting her real estate services in Westhaven. (Doc. No. 29-1 at 8–15.) Further, she argues that Southern Land employees corresponded with her by email regarding the websites using "Westhaven" in the domain names from February 21, 2013, through March 27, 2013, yet Southern Land made no objection to her using those domain names.

(Id.) Southern Land counters that Alyn's use of the term "Westhaven" between 2009 and 2013 was solely in a blog about life and community events in Westhaven, as opposed to her current use for promoting her real estate services. (Doc. No. 121 at 11.) It further argues that it never consented to her use of the domain names containing the term "Westhaven" beginning in 2013. (Id. at 11–13.)

Alyn has not provided sufficient evidence from which a reasonable jury could conclude that Southern Land affirmatively acquiesced to her use of its mark for her competing real estate business by assuring her that it would not enforce its trademark rights. At most, she has shown that Southern Land openly tolerated some of her uses of "Westhaven" for a period of time. Alyn has provided no evidence to support a finding that she was "misled . . . through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark," to preclude Southern Land from seeking to enjoin her from continuing to infringe on its mark. Kellogg, 209 F.3d at 574. Furthermore, assuming Southern Land was on notice in 2009 that Alyn was using its WESTHAVEN mark to promote her real estate business, the four years that passed before it made a demand that she cease and desist her infringement was not "so outrageous, unreasonable and inexcusable as to constitute a virtual abandonment of its right." Id. In Kellogg, the Sixth Circuit held that, as a matter of law, Kellogg did not acquiesce in Exxon's use of its cartoon tiger in connection with the sale of non-petroleum products even if it had waited twelve years from the time it should have known that Exxon was using the cartoon tiger to promote the sale of food products until it filed its lawsuit. (Id.) Southern Land's comparatively short delay is insufficient to support acquiescence in the absence of greater evidence that Southern Land affirmatively led Alyn to believe that it would not assert its trademark rights.

### b. Alyn's "Fair Use" Defense

Alyn argues that she is using the WESTHAVEN mark merely to describe the location where she lives and sells properties and that her use is therefore protected by the affirmative "fair use" defense. (Doc. No. 115 at 24.) The Lanham Act, 15 U.S.C. § 1115(b)(4), provides a defense to an infringement claim when a "defendant has used the mark: (1) in its descriptive sense; and (2) in good faith." ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 920–21 (6th Cir. 2003) (holding an artist's use of Tiger Woods' name to describe a picture of him was "purely descriptive" and used in good faith). "Under the fair use doctrine, the holder of a trademark cannot prevent others from using the word that forms the trademark in its primary or descriptive sense." Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 612 (6th Cir. 2009). "Rather, the only right of exclusion that trademark law creates in a descriptive word is in the secondary, new, 'trademark' meaning of the word that plaintiff has created. The original, descriptive primary meaning is always available for use by others to describe their goods, in the interest of free competition." Id. (quoting J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 11:45 (4th ed.1996)).

Alyn's use of the "WESTHAVEN" mark, at least in the instances at the heart of this litigation, does not constitute fair use because she is not using it merely to refer to where she lives and works. To the contrary, she is using the term in the name of her business and the domain names for her websites as part of the marketing of her competing real estate business. That is not to say, however, that simply because some of Alyn's uses of the term "Westhaven" fall outside of fair use that she is or should be forbidden from ever using the term at all. As an individual selling properties in Westhaven, Alyn has a right to fairly, accurately, and non-misleadingly use "Westhaven" in the conduct of her business. The questions of what Alyn may or may not do going forward and how many of her uses were infringing goes to the question of remedies and is outside the scope of this

opinion. For the purposes of judgment, however, the Court concludes that, at a minimum, Alyn's uses of WESTHAVEN in the name of her business and in domain names for websites marketing her real estate services fall outside of fair use and support a judgment in Southern Land's favor.

      **c. Conclusion on Southern Land's Claims for Trademark Infringement, False Designation of Origin, False or Misleading Description, and False or Misleading Misrepresentation and Alyn's Claims of Unfair Competition and Request for Declaratory Judgment**

As Southern Land has shown a likelihood of confusion between its marks and Alyn's business and domain names, and Alyn's acquiescence and fair use defenses fail, the Court enters judgment for Southern Land on its claims for trademark infringement and false designation of origin and on Alyn's claims for unfair competition. The Court denies Alyn's claim for declaratory judgment.

      **3. Southern Land's Cybersquatting Claim**

Southern Land alleges that Alyn's domain names containing the term "Westhaven" violate the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d)). "Cybersquatting" "occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." <u>DaimlerChrysler v. The Net Inc.</u>, 388 F.3d 201, 204 (6th Cir. 2004). To prevail on an ACPA claim, a trademark owner must establish the following: "(1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit." <u>Id.</u>

Southern Land's opening brief in support of its motion for summary judgment on its own claims does not cite the standard for prevailing on a cybersquatting claim. Furthermore, Southern Land did not address in either its opening or reply brief the standard for showing that Alyn had a "bad faith intent to profit" or present evidence to support such a finding. Because Southern Land has made no effort to develop argumentation on a necessary element of its claim, it has waived such argument. McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Without any discussion or argumentation of these factors by Southern Land, the Court is unwilling to conclude as a matter of law that Alyn's registration and use of the allegedly infringing domain names was undertaken in bad faith, even if Southern Land could establish the other factors needed to prevail on its cybersquatting claim. Southern Land's motion for judgment on this claim is therefore denied.

### 4. Alyn's Tortious Interference with Business Expectancies Claim

To prevail on a claim for intentional interference with business relationships under Tennessee law, a plaintiff must demonstrate:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means*; and finally, (5) damages resulting from the tortious interference.

Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002) (emphasis in original).

Alyn also claims that Southern Land has tortiously interfered with her business expectancies and relations by making misrepresentations to her business colleagues, service

providers, potential customers, and the public about Southern Land's "purported trademark rights" in the WESTHAVEN and W WESTHAVEN marks. (Doc. No. 37 at 10–11.) Southern Land's WESTHAVEN and W WESTHAVEN marks are incontestable, and it is not liable for intentionally interfering Alyn's business relationships for asserting its legal rights with respect to its protected marks.

Alyn also argues that Southern Land tortiously interfered with her ability to represent buyers of new construction homes and her relationship with WCAR, and "intended to interfere" with her relationship with her current broker, Coldwell Banker Barnes. (Doc. No. 115 at 25.) Alyn provides no citations to the record or to legal sources that support those claims. Thus, she has abandoned her tortious interference claim as to these incidents. McPherson, 125 F.3d at 995–96.

Alyn also claims that Southern Land tortiously interfered with her relationship with SilverPointe. Alyn argues that summary judgment is improper on this claim because her managing broker at SilverPointe, Guilbert, testified that part of the reason he terminated the relationship with Alyn was Southern Land's policy requiring him to be present for all communications between Alyn and Westhaven Realty. (Doc. No. 115 at 25 (citing Guilbert Dep., Doc. No. 114-12 at 16)). Guilbert also testified that Southern Land had never threatened SilverPointe with litigation, made defamatory statements against Alyn, implemented "discriminatory policies against SilverPointe," harassed SilverPointe, or pressured it to terminate its contracts with Alyn. (Doc. No. 114-12 at 17.) Alyn does not have evidence from which a reasonable jury could conclude that Southern Land intended to cause a termination of this business relationship or that it used any improper motive or means to do so. Furthermore, Alyn offers no evidence that she sustained damages as the result of the termination of her relationship with SilverPointe. (Doc. No. 115 at 23–26.) Judgment is entered for Southern Land on this claim.

### 5. Alyn's Defamation Claim

Alyn's defamation claim is based on the following: (1) the statements about Alyn in the WCAR ethics grievance that were published to WCAR, Guilbert, SilverPointe Properties, and others; (2) Southern Land's having falsely claimed that it has exclusive rights to use the WESTHAVEN trademarks; and (3) Southern Land's having knowingly published defamatory statements to developers, vendors, builders, clients, and potential clients of Alyn with the intent to harm her reputation, business, and goodwill in the community. (Doc. No. 37 at 12–13.) Southern Land seeks judgment on Alyn's defamation claim in its entirety. Alyn's motion for partial summary judgment seeks judgment on a portion of her defamation claim, focusing on three particular allegations about Alyn in the WCAR complaint, namely that she (1) eavesdropped on a represented buyer, (2) introduced herself to a represented buyer outside the presence of his agent, and (3) told the represented buyer not to buy a particular house. (Doc. Nos. 78-2 at 8; 115 at 28.)

To establish a prima facie case of defamation under Tennessee's common law, the plaintiff must establish that: (1) a party published a statement; (2) with knowledge that the statement is false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 571 (Tenn. 1999) (citing Restatement (Second) of Torts § 580 B (1977)). Only false statements are actionable; truth is a defense. W. v. Media Gen. Convergence, Inc., 53 S.W.3d 640, 645 (Tenn. 2001). Defamation does not occur "simply because the subject of a publication finds the publication annoying, offensive or embarrassing." Stones River Motors, Inc. v. Mid-S. Publ'g Co., 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983). Instead, the words must be "reasonably construable as holding the plaintiff up to public hatred, contempt, or ridicule." Davis v. The Tennessean, 83 S.W.3d 125, 130 (Tenn. Ct. App. 2001). In addition, to constitute actionable

defamation, the words must impair one's reputation and/or standing in the community and carry an element of disgrace. Id.; Stones River, 651 S.W.2d at 719.

### a. Southern Land's Claim to Rights to WESTHAVEN Marks

To the extent that Alyn's defamation claim rests on Southern Land's statements that it has exclusive rights to use the WESTHAVEN trademarks, it fails because the statements are, at least generally speaking, true. Media General, 53 S.W.3d at 645. Southern Land's failure to include an exegesis on the contours of trademark law, and what exactly its exclusive rights consisted of or did not consist of, is not enough to render its claims defamatory. Southern Land is therefore entitled to summary judgment on Alyn's defamation claim insofar as it is premised on Southern Land's claim to trademark rights.

### b. WCAR Ethics Grievance

The first consideration with regard to whether the ethics grievance was defamatory is whether the allegedly defamatory statements were published.[4] Woods v. Helmi, 758 S.W.2d 219, 223 (Tenn. Ct. App. 1988) ("[W]e do not reach the matter of privilege, malice or any other question until there is a publication."). "'Publication' is a term of art meaning the communication of defamatory matter to a third person." Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 571 (Tenn. 1999). Southern Land argues that the WCAR complaint was not published, citing Woods for the proposition that, "essential to the issue is the concept of 'need to know.'" Woods, 758 S.W.2d at 223. The Woods court found reports of problematic incidents related to a nurse anesthetist's performance with patients were not published for purposes of her libel claim because,

---

[4] As a preliminary matter, the Court notes that, although Southern Land indicates in its responses to Alyn's statement of undisputed facts that Magallanes filed the ethics complaint, not Southern Land (Doc. No. 103 at 1–2), it does not argue in its brief that it is not legally responsible for the content of the complaint. (Doc. Nos. 102; 84 at 25 (summarizing its defense); 121 at 15–17.) Thus, the Court turns to the merits of the claim.

even though those individuals in the "need to know" channel were employed by different corporate entities, the "free and uninhibited flow of information by and between the officers, agents and employees responsible for the operation of the Anesthesia Department and [the medical center] in general was mandatory." Id. at 224. According to Southern Land, just as the third-party recipients of communications in Woods needed to know about the misconduct of individuals under their supervision, the individuals at WCAR needed to know about the unethical conduct of their member realtor. (Doc. No. 84 at 28–29.)

However, the individual who made the allegedly defamatory report about the nurse's performance issue in Woods was her immediate supervisor, and the individuals who received the report all had "managerial, supervisory or administrative responsibilities and oversight for these internal affairs of [the medical center's] anesthesiology department and were immediately interested in the information transmitted." Woods, 758 F.W.2d at 222. Here, Magallanes and Southern Land were in competition with Alyn, and no one at WCAR had any supervisory or administrative responsibility for Alyn's work. The Court declines to extend Woods in the way Southern Land suggests. As Southern Land raises no additional argument or legal support for its assertion that there was no publication, and Alyn has offered evidence that agents of Southern Land made the allegations in the report known to WCAR and also a number of other individuals, Alyn has made a sufficient showing on the issue of publication to survive summary judgment.

Next, Southern Land argues that the statements in the WCAR complaint are protected by either absolute or qualified privilege—the two types of privileges that can be raised as a defense in a defamation case. Simpson Strong-Tie Co. v. Stewart, Estes & Donnell, 232 S.W.3d 18, 22 (Tenn. 2007). First, Southern Land argues that the statements contained in the WCAR complaint were protected by absolute privilege, citing Lambdin Funeral Serv., Inc. v. Griffith, 559 S.W.2d

791 (Tenn. 1978), which held that the absolute privilege that attaches to statements made in the course of a judicial proceeding that are relevant and pertinent to the issues involved "also holds true in administrative proceedings before boards or commissions that are clothed with the authority to revoke a license after a hearing for good cause shown." Id. at 792. In Lambdin, the administrative board at issue was the Tennessee Board of Funeral Directors and Embalmers, which does have the authority to revoke a license. Id. Southern Land concedes that the WCAR does not have the authority to revoke a real estate license, but asks the Court to extend its reasoning nonetheless. (Doc. No. 84 at 26–27 & n.5.) The Court declines to extend the holding in Lambdin, as the authority to revoke a license was clearly central to the Lambdin court's decision to extend absolute immunity that attaches to statements made in judicial proceedings to those made in administrative proceedings where the board has the authority to revoke a license. Lambdin, 559 S.W.2d at 792.

Southern Land next argues that the Court should find that the contents of the ethics complaint were qualifiedly privileged. (Doc. No. 84 at 27.) "A qualified privilege is based upon public policy that recognizes information should be given freely when necessary to protect the actor's own interests, the interests of another, or the interests of the public. Simpson Strong-Tie, 232 S.W.3d at 22 (citing Restatement (Second) of Torts at 243). "[A] qualified or conditional privilege is one that may be defeated if the defamatory publication was made with malice, ill-will, or for an improper purpose." Id. The Court agrees that the WCAR complaint was qualifiedly privileged, because the interests of the public are served by WCAR's efforts to monitor the conduct of its member realtors to ensure compliance with its ethical standards. Alyn is unable to defeat the qualified privilege that protects the contents of the WCAR complaint because she has no evidence that the statements in the complaint were made with malice or ill-will, or for an improper purpose.

Southern Land was entitled to utilize the WCAR grievance process to raise concerns about potentially unethical conduct by a member realtor.

Even if the WCAR complaint were not qualifiedly privileged, or if Alyn were able to defeat that privilege, the Court would nonetheless grant judgment to Southern Land on Alyn's defamation claim. Although the Court agrees with Alyn that the statements contained in the WCAR complaint potentially held her up to public hatred, contempt, or ridicule and carried an element of disgrace, she has not shown that Southern Land either had knowledge that the statements were false, recklessly disregarded their truth, or negligently failed to ascertain the truth of the statements. The only evidence is that Magallanes acted in good faith in reporting that Alyn was violating ethical rules as a realtor. Accordingly, the Court grants Southern Land's motion for summary judgment as to Alyn's defamation claims related to the WCAR complaint and denies Alyn's motion for partial summary judgment as to the specific allegations about her conduct that Magallanes included in that complaint.

### c. Other Alleged Defamatory Statements

Alyn alleges broadly that Southern Land knowingly published defamatory statements to developers, vendors, builders, clients, and potential clients of Alyn with the intent to harm her reputation, business, and goodwill in the community. (Doc. No. 37 at 12–13.) Although Alyn takes issue with Southern Land's reduction of her defamation claims to the categories of Southern Land's claims to trademark rights in the WESTHAVEN marks and the statements in the WCAR complaint, she does not provide evidence to support other allegedly defamatory statements that fall outside those categories. (Doc. No. 115 at 27–28.) Alyn has failed to show that there are disputed issues of material fact with respect to allegedly defamatory statements other than those encompassed by the statements related to Southern Land's trademark rights and the WCAR

complaint made by Magallanes. Accordingly, the Court grants Southern Land's motion for summary judgment as to all other allegedly defamatory statements.

## IV.    Conclusion

For the foregoing reasons, Alyn's motion for partial summary judgment on her defamation claim is **DENIED**, Southern Land's motion for partial summary judgment is **GRANTED** as to its statutory and common law trademark infringement claims and its false designation of origin claim, but **DENIED** as to its cybersquatting claim. Southern Land's motion for summary judgment on Alyn's claims is **GRANTED**. Southern Land's motion to exclude Alyn's proffered expert testimony is **DENIED** in part and **DENIED AS MOOT** in part. The claims for which no judgment has been entered on the threshold question of liability are Southern Land's claim under the Tennessee Consumer Protection Act, for which neither party sought summary judgment, and its cybersquatting claim. All questions regarding remedies for Southern Land's trademark and false designation of origin claims are reserved.

The Court will enter an appropriate order.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE